STEVE W. BERMAN (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

ELAINE T. BYSZEWSKI (SBN 222304)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone:  (213) 330-7150
Facsimile:  (213) 330-7152
elaine@hbsslaw.com

M. CRIS ARMENTA (SBN 177403)
CREDENCE E. SOL (SBN 219784)
THE ARMENTA LAW FIRM, APC
1230 Rosecrans Ave, Suite 300
Manhattan Beach, CA 90266
Telephone:  (310) 826-2826 Ext. 108
Facsimile:  (310) 695-2560
*cris@crisarmenta.com*
*credence.sol@orange.fr*

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE 1, individually and on behalf of all others similarly situated. | No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | |
| THE WEINSTEIN COMPANY HOLDINGS, LLC, MIRAMAX, LLC, HARVEY WEINSTEIN, and JOHN DOES 1-50, inclusive, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................. 3

II.  JURISDICTION AND VENUE ........................................... 7

III.  THE PARTIES .................................................................. 8

    A.  Plaintiff ................................................................... 8

    B.  Defendants ............................................................... 9

IV.  FACTS ............................................................................. 9

    A.  Weinstein's power in the entertainment industry – from his time at both Miramax and TWC – was extensive. ....................................................... 9

    B.  Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiff and the Class. ........... 11

    C.  Miramax and TWC facilitated Weinstein's predatory behavior ........... 20

    D.  TWC and Miramax are liable for Weinstein's conduct, because it was perpetuated within the scope of his employment .................................. 23

    E.  The Weinstein Sexual Enterprise harassed and misled Class members and the media with the intent to prevent the victims from reporting Weinstein's sexual misconduct and to destroy evidence of the sexual misconduct. ..................................................................... 25

        1.  Each member of the Weinstein Sexual Enterprise had a specific role in fulfilling their common purpose ..................................... 25

        2.  The Weinstein Sexual Enterprise, or "Army of Spies", engaged in a pattern of racketeering activity. .................................. 27

    F.  The statute of limitations is tolled based on the continuing violations doctrine, equitable estoppel, and the duress under which Weinstein threatened the Class if they complained. ............................... 34

V.  CLASS ALLEGATIONS ................................................... 39

VI.  CAUSES OF ACTION ..................................................... 42

COUNT I  VIOLATION OF 18 U.S.C. § 1962(C) (THE WEINSTEIN SEXUAL ENTERPRISE) ................................................................... 42

COUNT II  VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (THE WEINSTEIN SEXUAL ENTERPRISE) ............. 46

COUNT III  NEGLIGENT SUPERVISION AND RETENTION  VERSUS MIRAMAX ....................................................................... 48

CLASS ACTION COMPLAINT

COUNT IV  CIVIL BATTERY VERSUS WEINSTEIN AND MIRAMAX ........... 49

COUNT V  ASSAULT VERSUS WEINSTEIN AND MIRAMAX ........................ 50

COUNT VI  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS VERSUS WEINSTEIN AND MIRAMAX ................................................................. 52

COUNT VII ................................................................................................................ 54

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS VERSUS WEINSTEIN AND MIRAMAX ................................................................................. 54

COUNT VIII  RATIFICATION VERSUS MIRAMAX ........................................... 55

PRAYER FOR RELIEF ........................................................................................... 57

EXHIBIT A .............................................................................................................. 1

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jane Doe 1, individually and on behalf of all women who (i) met with Harvey Weinstein ("Weinstein") in person to audition for or to discuss involvement in a project to be produced or distributed by The Weinstein Company Holdings, LLC ("TWC"), and/or (ii) met with Harvey Weinstein in person to audition for or to discuss involvement in a project to be produced or distributed by Miramax LLC ("Miramax"), allege as follows:

## I.    INTRODUCTION

1.      The proverbial "casting couch" was Harvey Weinstein's office of choice, a choice facilitated and condoned by TWC and Miramax.  Plaintiff, and hundreds of other female actors like her, found themselves with Weinstein on the casting couch at offices, in hotel rooms, or at rooms at industry functions. Under the guise of meetings ostensibly to help further Class Members' careers or hire them for roles, Weinstein isolated Plaintiff and the Class Members in an attempt to engage in unwanted sexual conduct that took many forms: flashing, groping, fondling, battering, sexual assault, attempted rape and/or completed rape.

2.      Plaintiff and Members of the Class wanted to have careers in the film and/or TV industry and understood that Weinstein was a powerful force in the production world.  At all times, Plaintiff and the Class operated under duress and the threat of being blacklisted by Weinstein and major film producers such as Miramax if they refused Weinstein's unwanted sexual advances or complained about his behavior. To the extent a woman was "lucky" enough to escape physically unscathed,

CLASS ACTION COMPLAINT

Weinstein's behavior (and the fact it was facilitated by TWC and Miramax, the "Complicit Producers") nonetheless caused injury to their business prospects, career, reputation, and severe emotional distress.

3. Weinstein's power and the pervasiveness of his misconduct was recently summarized in *The New Yorker* as follows:

> Since the establishment of the first studios, a century ago, there have been few move executives as dominant, or as domineering, as Harvey Weinstein. He co-founded the production-and-distribution companies Miramax and the Weinstein Company, helping to reinvent the model for independent films with movies including "Sex, Lies, and Videotape," "The Crying Game," "Pulp Fiction," "The English Patient," "Shakespeare in Love," and "The King's Speech." Beyond Hollywood, he has exercised his influence as a prolific fund-raiser for Democratic Party candidates, including Barack Obama and Hillary Clinton. Weinstein combined a keen eye for promising scripts, directors, and actors with a bullying, even threatening, style of doing business, inspiring both fear and gratitude. His movies have earned more than three hundred Oscar nominations, and, at the annual awards ceremonies, he has been thanked more than almost anyone else in movie history, ranking just after Steven Spielberg and right before God.

> For more than twenty years, Weinstein, who is now sixty-five, has also been trailed by rumors of sexual harassment and assault. His behavior has been an open secret to many in Hollywood and beyond, but previous attempts by many publications, including *The New Yorker*, to investigate and publish the story over the years fell short of the demands of journalistic evidence. Too few people were willing to speak, much less allow a reporter to use their names, and Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts. Asia Argento, an Italian film actress and director, said that she did not speak out until now—Weinstein, she told me, forcibly performed oral sex

CLASS ACTION COMPLAINT

on her—because she feared that Weinstein would "crush" her. "I know he has crushed a lot of people before," Argento said. "That's why this story—in my case, it's twenty years old, some of them are older—has never come out."

On October 5th, *The New York Times*, in a powerful report by Jodi Kantor and Megan Twohey, revealed multiple allegations of sexual harassment against Weinstein, an article that led to the resignation of four members of the Weinstein Company's all-male board, and to Weinstein's firing.[1]

4.       Weinstein's widespread sexual misconduct did not occur without the help of others.  Rather, over time, Weinstein enlisted the aid of other firms and individuals to facilitate and conceal his pattern of unwanted sexual conduct.  This coalition of firms and individuals became part of the growing "Weinstein Sexual Enterprise," a RICO enterprise.  The Weinstein Sexual Enterprise had many participants and grew over time as the obfuscation of Weinstein's conduct became more difficult to conceal and included: (i)  TWC, Weinstein, and Miramax, all of whom are responsible for Weinstein's sexual offenses because Weinstein acted within the scope of his employment and/or these entities ratified or concealed Weinstein's conduct (collectively, the "Weinstein Participants"); (ii) third parties Kroll Associates, Inc. and Corporate Risk Holdings, LLC ("Kroll"), a global leader in corporate intelligence; B.C. Strategy U.K. Ltd. ("Black Cube"), a company comprised of a "select group of veterans from the Israeli elite intelligence units that specializes in tailored solutions to

---

[1] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

complex business and litigation challenges"[2]; Jack Palladino and Sara Ness of Palladino & Sutherland; and other investigators whose identities are currently unknown (collectively, the "Intelligence Participants"); (iii) lawyers and law firms, including, but not limited to, David Boies and Boies Schiller Flexner LLP; K&L Gates; BCL Burton Copeland; and Gross, Kleinhandler, Hodak, Halevy, Greenberg& Co. (collectively, the "Law Firm Participants"); (iv) co-producers of Miramax and TWC and other entertainment industry members (the "Film Participants"); and (v) journalists, including an unnamed freelance reporter, along with reporters from and the chief content officer (Dylan Howard) for American Media Inc., which publishes the *National Enquirer* (collectively, "Journalist Participants").  The identities of many of the members of the Weinstein Sexual Enterprise are currently unknown but discoverable through the discovery process.

5.     After the initial assault(s) were over, Weinstein engaged or directed private investigators, a "global provider of risk solutions," lawyers, and others (collectively, the "Weinstein Sexual Enterprise") or, as *The New Yorker* calls it, "Weinstein's Army of Spies"[3]) to harass, threaten, extort, and mislead his victims and the media to prevent the prosecution, reporting, or disclosure of his sexual misconduct. Weinstein and members of the Weinstein Sexual Enterprise also either directed or

---

[2] *See* www.blackcube.com (last accessed November 7, 2017).

[3] Ronan Farrow, "Harvey Weinstein's Army of Spies," The New Yorker (Nov. 6, 2017), available at https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies/amp (last accessed November 7, 2017).

CLASS ACTION COMPLAINT

facilitated the Weinstein Sexual Enterprise's destruction, mutilation, and concealment of records, documents, and/or other evidence in an effort to prevent the use of such evidence to reveal his sexual offenses.

6.    The Weinstein Sexual Enterprise's long-running practice of isolating and blacklisting Weinstein's victims and covering up Weinstein's predatory tactics should not be permitted to overcome the interests of the Plaintiff and the Class Members to proceed collectively, with strength together, in a unified manner in this class action. Plaintiff will seek certification of a Rule 23(c)(4) class for liability for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), civil battery, assault, and intentional and negligent infliction of emotional distress against the Complicit Producers and Weinstein.  Plaintiff will also seek certification of a Rule 23(c)(4) class for liability against the Complicit Producers for the negligent supervision or retention of an unfit officer, director and/or employee. Defendants' conduct has caused widespread damage, including personal injury, emotional distress, and damage to the careers of Plaintiff and the Class, for which Defendants must be held responsible.

## II.    JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

8.      This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are dozens, and likely hundreds, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and the Complicit Producers are citizens of a State different from that of Plaintiff and members of the Class. This Court also has subject matter jurisdiction over Plaintiff's and the proposed Class's claims pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

### III.   THE PARTIES

**A.    Plaintiff**

10.      Plaintiff Jane Doe 1 is a citizen of the United States and a resident of Lancaster, California.  As set forth more fully below, Jane Doe 1 auditioned with Weinstein for a part in a Miramax production. During her audition, Jane Doe 1 was assaulted by Weinstein, threatened, falsely imprisoned, and suffered emotional and physical distress, and was injured in her property or livelihood as a result of Weinstein's actions.  Weinstein told Jane Doe 1 that if she refused his advances and

his requests, he would ruin her, and he ultimately withdrew the offer he had given her for a part because she would not accede to his advances.

**B.      Defendants**

11.    Defendant The Weinstein Company Holdings, LLC is a Delaware limited liability company whose principal place of business is in New York, New York.

12.    Defendant Miramax LLC is a Delaware corporation headquartered in Santa Monica, California.

13.    Defendant Harvey Weinstein is a citizen of the United States and a resident of New York, New York.

## IV.    FACTS

**A.      Weinstein's power in the entertainment industry – from his time at both Miramax and TWC – was extensive.**

14.    In the late 1970s, using profits from their concert promotion business, brothers Harvey and Bob Weinstein created a small independent film-distribution company named Miramax, named after their parents, Miriam and Max.  The company's first releases were primarily music-oriented concert films such as Paul McCartney's *Rockshow.  The Secret Policeman's Other Ball* released in May 1982, became Miramax's first hit.  The Weinsteins slowly built upon this success throughout the 1980s with films that achieved critical attention and modest commercial success. Harvey Weinstein and Miramax gained wider attention in 1988 with the release of Errol Morris' documentary *The Thin Blue Line*, which detailed the struggle of Randall Adams, a wrongfully convicted Death Row inmate.  The publicity that soon

CLASS ACTION COMPLAINT

surrounded the case resulted in Adams' release and nationwide publicity for Miramax. In 1989, Steven Soderbergh's *Sex, Lies, and Videotape* propelled Miramax to become the most successful independent studio in America.

15.     Miramax continued to grow its library of films and directors. In 1993, after the success of *The Crying Game*, Disney offered to purchase Miramax from the Weinsteins for $80 million.  The Weinstein brothers agreed to the deal, which promised to cement their Hollywood clout and ensure that they would remain at the head of their company. The next year, Miramax released its first blockbuster, Quentin Tarantino's *Pulp Fiction*, and distributed the popular independent film *Clerks*.

16.     Miramax won its first Academy Award for Best Picture in 1997 with the victory of *The English Patient* (*Pulp Fiction* was nominated in 1995 but lost to *Forrest Gump*).  This started a string of critical successes that included *Good Will Hunting* (1997) and *Shakespeare in Love* (1998), both of which won numerous Academy Awards.

17.     The Weinstein brothers left Miramax on September 30, 2005, to form their own production company, TWC, with several other media executives.

18.     Attached as Exhibit A is a list of Weinstein-produced films that demonstrates his power and influence in the film industry.

19.     Plaintiff and the Class were aware of Weinstein's ability to make or break their careers.  Moreover, Weinstein wielded and was outspoken about his power and ability to either launch their careers or ruin them forever.

CLASS ACTION COMPLAINT

**B.     Weinstein's predatory behavior followed a pattern designed for his personal gratification at the expense of Plaintiff and the Class.**

20.     Wielding this unfettered power in the movie and television industry, Weinstein has admitted that his predatory and sexually harassing behavior toward female actresses was his *modus operendi*. For example, in an audio recording captured during a 2015 New York Police Department sting operation, Weinstein admitted that he groped a female model named Ambra Battilana Gutierrez, describing it as behavior he is "used to."[4]

21.     An executive who worked for Weinstein for many years reportedly told *The New Yorker*: "This wasn't a one-off. This wasn't a period of time. This was ongoing predatory behavior toward women—whether they consented or not."[5]

22.     The way in which Weinstein set up, harassed and assaulted Plaintiff and the members of the Class followed a pattern. As *The New York Times* explained:

> Across the years and continents, accounts of Mr. Weinstein's conduct share a common narrative: Women reported to a hotel for what they thought were work reasons, only to

_____

[4] An audio recording of Weinstein aggressively trying to persuade Ambra Battilana Gutierrez, a model, to come into his hotel room in 2015 while he showered was published by The New Yorker on October 10, 2017 and is available at https://www.youtube.com/watch?v=JVu02qk3-Jc (last accessed November 2, 2017). It is also available with closed captioning at https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories (last accessed November 2, 2017). When Ms. Battilana refused Mr. Weinstein, saying "I don't want to be touched" and "Please, I don't want to do something I don't want to do," he tells her, "Don't ruin your friendship with me" and "Never call me again." *Id.*

[5] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

discover that Mr. Weinstein, who has been married for most of three decades, sometimes seemed to have different interests. His home base was New York, but his rolling headquarters were luxury hotels: the Peninsula Beverly Hills and the Savoy in London, the Hôtel du Cap-Eden-Roc near the Cannes Film Festival in France and the Stein Eriksen Lodge near the Sundance Film Festival.[6]

23.     An employee who worked for Weinstein told *The New Yorker* that "the pattern of meetings was nearly uninterrupted in her years of working for Weinstein."[7]

24.     Since October 10, 2017, more than 60 women have reported that Weinstein used his power in the entertainment industry to sexually harass them. On information and belief, these reports are just the beginning of the revelation of the full scope of Weinstein's misconduct. All of these reports follow the same pattern. For illustrative purposes of Weinstein's pattern and practice of sexual harassment against Plaintiff and the Class, Plaintiff provides the following non-exhaustive list of examples of Weinstein's predatory behavior:

25.     ***Weinstein's pattern of using the guise of helping female actresses with their careers was typically the start:***

      a.     After Weinstein hired her for the lead in *Emma*, but before shooting began in or about 1994, Gwyneth Paltrow received a faxed schedule from her agents at Creative Artists Agency

---

[6] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[7] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

CLASS ACTION COMPLAINT

scheduling a meeting with Weinstein in his suite at the Peninsula Beverly Hills for a work meeting.[8]

b.  In 1996, starring in a new film to which Miramax had just obtained the rights, Judith Godrèche was invited to a breakfast meeting with Weinstein and a female executive to discuss the movie.[9]

c.  Asia Argento, a 21-year-old actress with a role in a Miramax film released in the United States in 1999, was told during filming in 1997 to attend a party thrown by Miramax at a hotel and was brought to the hotel by another producer.[10]

d.  In the 1990s, Rosanna Arquette was supposed to meet Weinstein for dinner at a hotel to pick up the script for a new film.[11]

e.  In the 1990s, Weinstein invited Ashley Judd to the Peninsula Hotel for a business breakfast meeting.[12]

f.  In or about 1997, Weinstein invited himself to Mira Sorvino's apartment – after midnight – to tell her about "new marketing ideas" for a film she was in.[13]

g.  In 2003, acting in small gigs, Dawn Dunning was invited by Weinstein's assistant to a meal with Weinstein at a New York hotel.[14]

---

[8] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[9] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[10] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[11] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[12] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[13] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[14] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

CLASS ACTION COMPLAINT

h.   Wanting to be an actress, Lucia Stoller was approached by Weinstein in 2004, who had an assistant call to set up a daytime meeting at the Miramax office in Tribeca, first with Weinstein and then with a casting executive, who was a woman (which made Lucia feel safer).[15]

i.   In 2010, Weinstein told actress Emma de Caunes he was interested in casting her in the lead role of a movie adapted from a book, asking her to come to his hotel room after lunch to get the book.

j.   In January 2011, Weinstein invited Jessica Barth to a business meeting at the Peninsula Hotel to talk "career stuff." [16]

26.   ***When the actresses arrived for their "meeting," they were isolated from the public and employees:***

a.   Although Lucia Stoller's meeting took place at Miramax, "[s]he was led to an office with exercise equipment in it, and takeout boxes on the floor. Weinstein was there, alone."[17]

b.   A producer led Asia Argento to what she thought was a Miramax party at a hotel, taking her to a hotel room "empty but for Weinstein."[18]

c.   When Rosanna Arquette showed up for dinner at a hotel restaurant with Weinstein, she was told to meet him in his room.[19]

d.   When Jessica Barth arrived at the Peninsula Hotel for a business meeting, Weinstein told her on the phone to come to his room.[20]

---

[15] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[16] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[17] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[18] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[19] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

CLASS ACTION COMPLAINT

e.   When Ashley Judd arrived at the Peninsula Hotel for a business meeting, she was told to meet him in his room.[21]

f.   After a breakfast meeting with Weinstein and a female executive, the female executive left, leaving Judith Godrèche alone with Weinstein, who told her to join him in his room to discuss the film's marketing and an Oscar campaign.[22]

g.   When Dawn Dunning arrived at the hotel for a meeting, she was told that Weinstein's earlier meeting was running late and to head up to his suite.[23]

27.   ***Once isolated, Weinstein battered, assaulted or attempted to assault the women:***

a.   Rose McGowan: In a hotel room in 1997, "…HW raped me."[24]

b.   Lucia Stoller: "'He forced me to perform oral sex on him.' As she objected, Weinstein took his penis out of his pants and pulled her head down onto it. 'I said, over and over, 'I don't want to do this, stop, don't.''"[25]

c.   Asia Argento: Weinstein left the hotel room and returned "wearing a bathrobe and holding a bottle of lotion. 'He asks me to give a massage. I was, like, 'Look, man, I am no fucking fool.'" "[A]fter she reluctantly agreed to give Weinstein a massage, he pulled her

---

[20] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[21] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[22] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[23] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[24] https://www.thesun.co.uk/news/4673738/rose-mcgowan-harvey-weinstein-rape-claims-amazon-jeff-bezos/, *quoting* tweet from Rose McGowan.

[25] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

CLASS ACTION COMPLAINT

skirt up, forced her legs apart, and performed oral sex on her as she repeatedly told him to stop." [26]

    d.    Mira Sorvino: In a hotel room, Weinstein started massaging her shoulders and then chased her around the room.[27]

    e.    Sophie Dix: Weinstein masturbated in front of her after Dix said "no a thousand times," causing Dix to lock herself in the bathroom.[28]

    f.    Emma de Caunes: Weinstein went into the hotel bathroom, turned on the shower, returned naked with an erection, and demanded she lie on the bed.[29]

    g.    Rosanna Arquette: Weinstein answered his hotel door in a bathroom, tried to force Arquette to give him a neck massage, and pulled her hand toward his erect penis.[30]

    h.    Jessica Barth: Weinstein demanded a naked massage in his bed.[31]

    i.    Ashley Judd: Weinstein appeared in a bathrobe, asking if he could give her a massage or she could watch him shower.[32]

    j.    Gwyneth Paltrow: Weinstein touched her, suggesting they head to his bedroom for massages.[33]

---

[26] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[27] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[28] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[29] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[30] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[31] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[32] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

CLASS ACTION COMPLAINT

k.      Angelina Jolie: Weinstein made unwanted advances on her in a hotel room.[34]

l.      Katherine Kendall: Weinstein undressed and chased her around a living room.[35]

m.     Judith Godrèche: After Godrèche declined to give him a massage, "he's pressing against me and pulling off my sweater."[36]

n.      Dawn Dunning: In his bathrobe, Weinstein told Dunning that he had contracts for her for his next three films, but that she could only sign them if she would have three-way sex with him. When Dunning laughed, assuming Weinstein was joking, Weinstein became angry, stating: "You'll never make it in this business. This is how the business works."[37]

o.      Darryl Hannah: On multiple occasions, Weinstein tried to barge into her hotel room at night; she escaped out back doors; she used furniture to bar the door; and she had her male make-up artists present when Weinstein was able to secure a key to her room without her consent. *The New Yorker* reported: Weinstein "'had a key,' Hannah recalled. 'He came through the living room and into the bedroom. He just burst in like a raging bull. And I know with every fibre of my being that if my male makeup artist was not in that room, things would not have gone well. It was scary.' [Hannah's make-up artist] remembered the incident vividly. 'I was there to keep her safe,'" he told *The New Yorker*.[38]

---

[33] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[34] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[35] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[36] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[37] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[38] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein (last accessed November 7, 2017).

CLASS ACTION COMPLAINT

p.    Paz de la Huerta – first rape: In November 2010, Weinstein offered de la Huerta a cab ride home after bumping into her at a hotel bar in New York and then demanded to come in for a drink: "'Immediately when we got inside the house, he started to kiss me and I kind of brushed [him] away,' de la Huerta said. 'Then he pushed me onto the bed and his pants were down and he lifted up my skirt. I felt afraid. . . . It wasn't consensual . . . It happened very quickly. . . . He stuck himself inside me. . . . When he was done he said he'd be calling me. I kind of just laid on the bed in shock.'"[39]

q.    Paz de la Huerta – second rape: In December 2010, Weinstein showed up in her building lobby after she came home from a photo shoot: "'He hushed me and said, 'Let's talk about this in your apartment,'" de la Huerta said. 'I was in no state. I was so terrified of him. . . . I did say no, and when he was on top of me I said, 'I don't want to do this.' He kept humping me and it was disgusting. He's like a pig. . . . He raped me.'"[40]

28.    These were not isolated instances, but the practiced role and pattern of a predator. Like these Class Members and countless others, Plaintiff's experiences followed the same script:

29.    While at an audition on the first floor of a building also occupied by Miramax, an associate of Weinstein's invited Jane Doe 1 to meet Weinstein in his private office on another floor, because he was reportedly casting a film and was looking for an actress who had her "look". The meeting was timed for the end of the workday. Jane Doe 1 shook hands, provided her headshot and resume to Weinstein and engaged in cordial pleasantries and polite conversation. Weinstein then asked her

---

[39] https://www.vanityfair.com/hollywood/2017/11/paz-de-la-huerta-harvey-weinstein-allegations (last accessed November 7, 2017).

[40] https://www.vanityfair.com/hollywood/2017/11/paz-de-la-huerta-harvey-weinstein-allegations.

CLASS ACTION COMPLAINT

to read from a script, explaining that he was looking for a new face with a "very European look."  Jane Doe 1 and Weinstein then read from three pages of the  untitled script; she read a few more pages with him upon his request.  Weinstein appeared very happy and pleased and told her he had several other projects she might "be right for." He told Jane Doe 1 that she was "exactly what I am looking for" and that she had gotten the part and told her to take the script home to study. Jane Doe 1 placed the script in her briefcase and prepared to leave. Weinstein then told her he "just needed one more thing from you." He asked her to disrobe and explained he needed to see her breasts, repeatedly stating, "It's just your breasts."  When Jane Doe 1 refused repeatedly, Weinstein told her to "take your dress down" and "you are going to need to expose them."  Weinstein told Jane Doe 1 that the role required him to review and approve of her breasts.  Jane Doe 1, realizing she was about to be sexually assaulted, was terrified.

30.     When Jane Doe 1 continued to refuse, Weinstein angrily inquired whether she knew who he was, told her he could "make" her or "break" her, and that she would "never work in this town again."  "You know, I could launch your career and I can make you or I can break you," he insisted, again demanding that she expose her breasts.  Weinstein then told Jane Doe 1 to "Give me my script back."  Weinstein was belligerent and ranting.  He told her, "Without me, you will never work again."

31.     Weinstein then told Jane Doe 1 to show herself out and advised her she could not use the main door.  He corralled her to a side door that led into a pitch-black

stairwell. He then locked the door behind her.   Jane Doe 1, realizing she was locked in, banged on the door and begged to be let out.  Scared and upset, she panicked, walking up and down flights of stairs, banging on doors and yelling on each landing that she was locked in – all the while not knowing whether Weinstein would return and assault her further. Terrified and sweating through her dress, Jane Doe 1 feared for her safety and life.  Finally, a maintenance worker heard her yelling and let her out; that worker immediately asked Jane Doe 1 if she was coming from Weinstein's floor.

32.     This assault was profoundly disturbing and life changing for Jane Doe 1. As a result, Jane Doe 1 has changed how she conducts her life, pursues her career, takes meetings and interacts with men both personally and professionally.  She limits interactions that are one-on-one, even though those meetings are necessary to connect and bond with both professional colleagues and personal acquaintances. Her professional and personal interactions are thus limited by her fears generated by Weinstein's assault. In other words, Jane Doe 1 lost the part Weinstein offered, lost other opportunities at Miramax and TWC, and has lost other professional opportunities as the consequence of Weinstein's assault.

**C.     Miramax and TWC facilitated Weinstein's predatory behavior.**

33.     The "Complicit Producers" Miramax and TWC often aided and abetted Weinstein in the commission of his sexual misconduct. For example, female employees of TWC were often used as "honeypots" to make Weinstein's victims feel safe. The "honeypots" would initially join a meeting along with a Class Member or

woman in whom Weinstein was interested. Weinstein would dismiss the employee, leaving him alone with his female target.[41]

34.     Sixteen current and former executives and assistants at TWC told a reporter from *The New Yorker* about a pattern of professional meetings that were pretexts for sexual advances on young actresses and models. "All sixteen said that the behavior was widely known within both Miramax and the Weinstein Company."[42]

35.     Irwin Reiter, the Executive Vice President of Accounting and Financial Reporting at TWC from 2005 to the present and who previously worked in the same capacity from 1989 to 2005 at Miramax,[43] sent messages to Emily Nestor, a temporary employee of TWC, who alleged that she was harassed, describing Weinstein's "mistreatment of women" as a serial problem at TWC.[44]

36.     A female executive at the Complicit Producers told *The New Yorker*: "There was a large volume of these types of meetings that Harvey would have with aspiring actresses and models." "He would have them late at night, usually at hotel

---

[41] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[42] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[43] https://www.linkedin.com/in/irwin-reiter-58828a4/.

[44] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

CLASS ACTION COMPLAINT

bars or in hotel rooms. And, in order to make these women feel more comfortable, he would ask a female executive or assistant to start those meetings with him."[45]

37.     A female employee at TWC, Lauren O'Connor, wrote in a memo obtained by *The New York Times* that Weinstein required her to schedule casting discussions with aspiring actresses after they had private appointments in his hotel room. "She suspected that she and other female Weinstein employees, she wrote, were being used to facilitate liaisons with 'vulnerable women who hope he will get them work.'"[46]

38.     Mark Gil, the former president of Miramax Los Angeles from approximately 1994 to 2002,[47] told *The New York Times* that behind the scenes at Miramax, Weinstein's treatment of women "was the biggest mess of all."[48]

39.     TWC ratified Weinstein's conduct – and found it an acceptable part of his employment so long as it made a profit on it. According to TMZ.com, which reportedly obtained a copy of Weinstein's 2015 employment contract, Weinstein and TWC agreed that "if he gets sued for sexual harassment or any other 'misconduct' that

---

[45] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[46] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

[47] http://articles.latimes.com/2002/oct/16/business/fi-gill16.

[48] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

CLASS ACTION COMPLAINT

results in a settlement or judgment against TWC, all Weinstein has to do is pay what the company's out, along with a fine, and he's in the clear."[49]

40.     Allegedly, the contract provides that, if Weinstein "'treated someone improperly in violation of the company's Code of Conduct,' he must reimburse TWC for settlements or judgments. Additionally, 'You [Weinstein] will pay the company liquidated damages of $250,000 for the first such instance, $500,000 for the second such instance, $750,000 for the third such instance, and $1,000,000 for each additional instance.'"[50]

41.     Weinstein and TWC further agreed that Weinstein's payment "constitutes a 'cure' for the misconduct and no further action can be taken."[51]

42.     These provisions in an employment contract are unique – and reflect TWC's knowledge that Weinstein was more likely than not to engage in sexual harassment and other misconduct affecting the Class and female employees.

**D.     TWC and Miramax are liable for Weinstein's conduct, because it was perpetuated within the scope of his employment.**

43.     Miramax's and TWC's executives, officers and employees had actual knowledge of Weinstein's repeated acts of sexual misconduct with women. In particular, Defendants were aware of Weinstein's pattern of using his power to coerce

---

[49] https://www.tmz.com/2017/10/12/weinstein-contract-the-weinstein-company-sexual-harassment-firing-illegal/ (last accessed November 7, 2017).

[50] *Id.*

[51] *Id.*

CLASS ACTION COMPLAINT

and force young actresses to engage in sexual acts with him. This knowledge was possessed by Defendants' Board of Directors, including, upon information and belief, Bob Weinstein.

44.     Defendants were aware of allegations of sexual misconduct against Weinstein going back to the 1990s.

45.     Mira Sorvino, who was harassed by Weinstein, told a Miramax female employee about the harassment. Rather than shock and horror at Weinstein's action, the employee's reaction "'was shock and horror that I had mentioned it.'"[52]

46.     Kathy DeClesis, Bob Weinstein's assistant in the early 1990s at Miramax stated to *The New York Times*: "It [Weinstein's harassment of women] wasn't a secret to the inner circle."[53]

47.     Weinstein's 2015 employment contract with TWC also reflects that the acts of sexual harassment did or were highly likely to occur within the scope of his employment, providing contingency payments to cover the business expenses associated with such occurrences.

---

[52] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[53] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html.

**E.    The Weinstein Sexual Enterprise harassed and misled Class members and the media with the intent to prevent the victims from reporting Weinstein's sexual misconduct and to destroy evidence of the sexual misconduct.**

**1.    Each member of the Weinstein Sexual Enterprise had a specific role in fulfilling their common purpose.**

48.    Throughout the Class Period, the Weinstein Sexual Enterprise had the common purpose of preventing (or attempting to prevent) the reporting, prosecution, or disclosure of Weinstein's sexual misconduct through harassment, threats, extortion, and misrepresentations to Weinstein's victims and the media. The Weinstein Sexual Enterprise also shared the common purpose of destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report, prosecute, and/or publicize Weinstein's sexual offenses, including, but not limited to, the execution of non-disclosure agreements intended to cover up, squelch, and maintain the veil of secrecy around Weinstein's offenses, with threat of legal proceedings or financial duress if the victims were to disclose their experiences.

49.    Each member of the Enterprise played a role in directing and participating in the Weinstein Sexual Enterprise.

50.    The Weinstein Participants determined the members of the Weinstein Sexual Enterprise and assigned each member of the enterprise its task in fulfilling the common purpose of using false pretenses to prevent the publication or reporting of Weinstein's sexual misconduct and to destroy evidence. Weinstein monitored the progress of the investigations personally.

51.     The Complicit Producers, TWC and Miramax, each allowed Weinstein to conduct business at their offices and were aware of his misconduct and agreed to conceal it so that they could continue to benefit from the lucrative collaboration with Weinstein.

52.     The Intelligence Participants targeted dozens of Class Members and reporters, using false names and identities to gather information from them regarding Weinstein's sexual offenses, recording conversations in violation of law, and compiling psychological profiles that focused on the Class Members' personal or sexual histories that could be used to extort those individuals' silence. The Intelligence Participants also destroyed or concealed evidence, including, but not limited to, documents and recordings.

53.     The Film Participants collected names of Class Members and reporters with information concerning Weinstein's sexual offenses and placed calls to the Class Members and reporters to intimidate them and prevent them from reporting Weinstein's sexual misconduct.

54.     The Law Firm Participants provided cover and shield to the Weinstein Participants by contracting with the Intelligence Participants on behalf of the Weinstein Participants and permitting the Weinstein Participants to protect evidence of Weinstein's misconduct under the guise of the attorney-client privilege or the doctrine of attorney work product when that was not the case. The Law Firm

CLASS ACTION COMPLAINT

Participants also approved the Intelligence Participants' "operational methodologies," which were illegal.

55.     The Journalist Participants also gathered information from Weinstein's victims regarding Weinstein's sexual offenses under the pretense of writing a story, illegally recorded conversations, and compiled profiles that focused on their personal or sexual histories that could be used to extort those individuals' silence.

**2.     The Weinstein Sexual Enterprise, or "Army of Spies", engaged in a pattern of racketeering activity.**

56.     As an example of how the Enterprise worked, in 2016 and 2017, Weinstein learned that several reporters were talking to Class Members regarding their allegations of rape, battery and assault by Weinstein. Weinstein directed the Law Firm Participant Boies Schiller to retain the Intelligence Participant Black Cube to investigate which Class Members were providing information, to gather intelligence to prevent the reporting or publication of the accusations, and to secretly record Class Members' conversations.[54]

57.     Boies Schiller and Black Cube signed a contract to help Weinstein Sexual Enterprise in October 2016. They also signed several subsequent contracts for the same purposes. On or about October 28, 2016, Boies Schiller wired Black Cube an initial payment of $100,000 to fulfill those purposes.[55]

---

[54] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[55] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

CLASS ACTION COMPLAINT

58.     Rose McGowan intended to publish a book detailing how Weinstein raped her in 1997. Weinstein directed the Law Firm Participant Boies Schiller to retain the Intelligence Participant Black Cube to prevent the reporting of the rape,[56] and Black Cube agreed to do so.

59.     Boies Schiller did retain Black Cube with a contract dated July 11, 2017, providing that the project's "primary objectives" are to "provide intelligence which will help the Client's efforts to completely stop the publication of a new negative article in a leading NY newspaper" and to "obtain additional content of a book which currently being written and includes harmful negative information on and about the Client," who allegedly is identified as Weinstein in multiple documents obtained by *The New Yorker*.[57]

60.     The July 11, 2017 contract included several "success fees" if Black Cube met its goals, including $300,000 if the agency "provide[d] intelligence which will directly contribute to the efforts to completely stop the Article from being published at all in any shape or form" and $50,000 if it secured "the other half" of McGowan's book "in readable book and legally admissible format."[58]

---

[56] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[57] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[58] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

61.     The contract between Boies Schiller and Black Cube included a description of the duplicitous tactics to be used to accomplish the objectives of the Weinstein Sexual Enterprise.[59]

62.     Black Cube agreed to provide "a dedicated team of expert intelligence officers that will operate in the USA and any other necessary country," including a project manager, intelligence analysts, linguists, and "Avatar Operators" specifically hired to create fake identities on social media, along with "operations experts with extensive experience in social engineering." The agency also said that it would provide "a full time agent by the name of 'Anna' (hereinafter 'the Agent'), who will be based in New York and Los Angeles as per the Client's instructions and who will be available full time to assist the Client and his attorneys for the next four months." According to *The New Yorker*, four sources with knowledge of Weinstein's work with Black Cube confirmed that this was the same woman who would meet with McGowan and Wallace under false pretenses.[60]

63.     Black Cube also agreed to hire "an investigative journalist, as per the Client request," who would be required to conduct ten interviews a month for four months and be paid forty thousand dollars. Black Cube agreed to "promptly report to the Client the results of such interviews by the Journalist."[61]

---

[59] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[60] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[61] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

CLASS ACTION COMPLAINT

64.     Black Cube did fulfill its contract with Boies in furtherance of the Weinstein Sexual Enterprise's objectives. In May, 2017, Rose McGowan received an e-mail from a literary agency introducing her to a woman who identified herself as Diana Filip, the deputy head of sustainable and responsible investments at Reuben Capital Partners, a London-based wealth-management firm. In reality, Filip was an employee of Black Cube, which had developed the fictional Reuben Capital Partners. According to *The New Yorker*, "Diana Filip" was an alias for a former officer in the Israeli Defense Forces who originally hailed from Eastern Europe. [62]

65.     Duplicitously claiming in an email that she was launching an initiative to combat discrimination against women in the workplace, Filip asked McGowan to speak at a gala kickoff event for a fee of sixty thousand dollars. Using false pretenses, Filip met with McGowan on at least four occasions, including at the Peninsula Hotel in Beverly Hills, in hotel bars in Los Angeles and New York, and on the Venice boardwalk.  Filip repeatedly told McGowan that she wanted to make a significant investment in McGowan's production company. The purpose of these meetings, which were secretly recorded by the Intelligence Participant Black Cube, was to secretly extract information regarding Weinstein and to prevent the publication of McGowan's book and/or the reporting of accusations against Weinstein. [63]

---

[62] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[63] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

CLASS ACTION COMPLAINT

66.     At one meeting in September 2017, Filip was joined by another Black Cube operative, who used the name Paul and claimed to be Filip's colleague at Reuben Capital Partners. The purpose of the meeting was to pass McGowan to another operative to extract more information. [64]

67.     Black Cube used information extracted from McGowan regarding McGowan's reporting of the rape to a reporter at *The New Yorker* to contact the reporter in an attempt to prevent the publication of the accusation. [65]

68.     In 2016, Black Cube's Filip used a second alias, "Anna," to meet twice with Ben Wallace, a reporter from New York who was working on a story about Weinstein, suggesting she had an allegation against Weinstein. However, Anna never shared information, but instead pushed the reporter for information about what he knew and who he was talking to.  During their second meeting, Anna requested that they sit close together, leading Wallace to suspect that she was secretly recording their conversation. [66]

69.     Filip also allegedly used her alias to email Jodi Kantor, a reporter for *The New York Times*, regarding a story about Weinstein. [67]

---

[64] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[65] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[66] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[67] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

CLASS ACTION COMPLAINT

70.     Black Cube also retained a freelance journalist to further the objectives of the Weinstein Sexual Enterprise, providing the journalist with contact information for actresses, journalists, and Weinstein's business rivals. The freelancer conducted interviews to be used by the Weinstein Sexual Enterprise and provided summaries of those interviews to Black Cube, which then sent the summaries to one or more Law Firm Participants, including Boies Schiller. [68]

71.     In January 2017, the freelance journalist called McGowan and secretly recorded their lengthy conversation. He also contacted other Class Members (including the actress Annabella Sciorra) and reporters Ben Wallace from New York and Ronan Farrow from *The New Yorker* in furtherance of the objectives of the enterprise. [69]

72.     Weinstein also enlisted Dylan Howard, the chief content officer of American Media Inc., which publishes the *National Enquirer*, to have his reporters obtain information that would discredit McGowan.  Howard obtained secret recordings of those interviews from his reporters and shared them with Weinstein to be used to discredit victims of Weinstein's sexual offenses. [70]

73.     Examples of Kroll's participation in the Weinstein Sexual Enterprise include the destruction of evidence.  After Ambra Battilana Gutierrez, an Italian

---

[68] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[69] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[70] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

CLASS ACTION COMPLAINT

model, accused Weinstein of sexually assaulting her in 2015, Weinstein required her to surrender all her personal devices to Kroll so that they could be wiped of evidence of a conversation in which Weinstein admitted to groping her.[71]

74.     Recent e-mails obtained by *The New Yorker* also purportedly show that Dan Karson, the chairman of Kroll America's Investigations and Disputes practice, contacted Weinstein at his personal e-mail address with information intended to discredit Class Members.[72]

75.     Another Intelligence Participant, Palladino & Sutherland ("Palladino"), produced detailed profiles of various Class Members with information to be used to undermine their credibility. Palladino sent Weinstein a 100+-page report in December 2016, featuring McGowan's address and other personal information, along with sections labeled "Lies/Exaggerations/Contradictions," "Hypocrisy," "Potential Negative Character Wits" [*sic* Witnesses], and "Past Lovers."[73]

76.     Other unidentified Intelligence Participants prepared similar reports. One such profile targeted Rosanna Arquette, an actress who later, in *The New Yorker*, accused Weinstein of sexual harassment. The file mentions Arquette's friendship with

---

[71] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[72] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.
[73] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

CLASS ACTION COMPLAINT

McGowan, social-media posts about sexual abuse, and the fact that a family member had gone public with an allegation that she had been molested as a child. [74]

**F.     The statute of limitations is tolled based on the continuing violations doctrine, equitable estoppel, and the duress under which Weinstein threatened the Class if they complained.**

77.     The power Weinstein wielded – and his ability to blacklist an actress for complaining about his predatory behavior – was so legendary that it was the rule in the entertainment industry that actresses needed to acquiesce to Weinstein to succeed. This rule was so widely accepted that male producers and actors laughingly voiced their expectations that Plaintiff and the Class had and would follow it to further their careers. For example, at the 2013 Academy Awards ceremony, Seth MacFarlane, the creator of *Family Guy*, was onstage to announce the five nominees for best supporting actress when he stated: "Congratulations, you five ladies no longer have to pretend to be attracted to Harvey Weinstein."[75]

78.     If actresses did not accede to his demands, "Weinstein and his associates used nondisclosure agreements, payoffs, and legal threats to suppress their accounts."[76] This uniform response to those who challenged Weinstein's behavior, which was widely known throughout the industry, actually and reasonably placed

---

[74] https://www.newyorker.com/news/news-desk/harvey-weinsteins-army-of-spies.

[75] http://ew.com/tv/2017/10/11/seth-macfarlane-harvey-weinstein-jessica-barth/ (last accessed November 1, 2017).

[76] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

class members under duress and induced them to forebear asserting their legal rights in response to Weinstein's actions.

79.     For example, Asia Argento, an Italian film actress and director, said that she did not speak out until 2017, after Weinstein had "forcibly performed oral sex on her" years before, "because she feared that Weinstein would 'crush' her. 'I know he has crushed a lot of people before… That's why this story—in my case, it's twenty years old, some of them are older—has never come out.'"[77]

80.     Four actresses, including Mira Sorvino and Rosanna Arquette, told *The New Yorker* that "they suspected that, after they rejected Weinstein's advances or complained about them to company representatives, Weinstein had them removed from projects or dissuaded people from hiring them." Multiple sources told the same reporter that "Weinstein frequently bragged about planting items in media outlets about those who spoke against him; these sources feared similar retribution."

81.     Several sources "pointed to Gutierrez's case: after she went to the police, negative items discussing her sexual history and impugning her credibility began rapidly appearing in New York gossip pages. (In the taped conversation, part of which

---

[77] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

*The New Yorker* posted online, Weinstein asks Gutierrez to join him for "five minutes," and warns, "Don't ruin your friendship with me for five minutes.")"[78]

82.  Women who spoke to *The New Yorker* on condition of anonymity "were too afraid to allow me to use their names, but their stories are uncannily similar to these allegations. One, a woman who worked with Weinstein, explained her reluctance to be identified. 'He drags your name through the mud, and he'll come after you hard with his legal team.'"[79]

83.  Mira Sorvino, who rejected Weinstein's advances and complained about his harassment to Miramax "felt that saying no to Weinstein and reporting the harassment had ultimately hurt her career." She told a New Yorker reporter: "…I definitely felt iced out and that my rejection of Harvey had something to do with it."[80]

84.  After Gwyneth Paltrow was harassed, she complained to her then-boyfriend Brad Pitt, who confronted Weinstein. Weinstein subsequently called and berated Paltrow for disclosing what happened. Paltrow feared she would be fired from the Miramax film *Emma* if she complained further.[81]

---

[78] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[79] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[80] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[81] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

CLASS ACTION COMPLAINT

85.     After Judith Godrèche complained to a female producer at Miramax about Weinstein's harassment, she was told not to say anything so as not to endanger the release of the Miramax films in which she appeared.[82]

86.     Darryl Hannah felt immediate repercussions from turning down Weinstein's advances and sexual demands. A Miramax plane on a film tour left without her, her plane and hotel reservations were cancelled, and her hair and make-up artist was let go.[83]  Darryl Hannah was not about to let Weinstein's actions go, however – she complained to her manager, a producer on the film, and her director, Quentin Tarantino, who has since admitted that he did nothing.[84] Nonetheless, Hannah not only was not believed but also, consistent with the objectives of the Weinstein Sexual Enterprise, was "'berated, criticized, and blamed.'"[85]

87.     Moreover, "Weinstein enforced a code of silence; employees of the Weinstein Company have contracts saying they will not criticize it or its leaders in a

---

[82] https://www.nytimes.com/2017/10/10/us/gwyneth-paltrow-angelina-jolie-harvey-weinstein.html?article-sidebar.

[83] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

[84] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

[85] https://www.newyorker.com/news/news-desk/weighing-the-costs-of-speaking-out-about-harvey-weinstein.

CLASS ACTION COMPLAINT

way that could harm its 'business reputation' or 'any employee's personal reputation,'
a recent document shows."[86]

88.     Shortly before *The New York Times* and *The New Yorker* finally revealed
the decades-long pattern of harassment, Weinstein and his legal team began calling
Class Members, threatening them for talking. They also threatened to sue *The New
York Times* and other media outlets.[87]

89.     The type of emotional and physical abuse Weinstein used to command
silence from his victims and cover up his assaults has been studied by psychologists.
Psychologists John Gottman and Neil Jacobsen, authors of *When Men Batter Women*
(first published in 1998 and reissued in 2007), extensively researched emotional abuse
and domestic violence and created a 27-question survey designed to help doctors
establish whether patients were suffering from systematic abuse at the hands of a
partner. The four factors that determine emotional violence, Gottman and Jacobson
concluded, were isolation, degradation, sexual abuse, and property damage.  Each of
these factors can be found in Weinstein's abuse of Plaintiff and the Class.

90.     The statute of limitations was thus tolled at least until *The New York
Times* published a powerful report revealing allegations of sexual harassment against

---

[86] https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-
allegations.html.

[87] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-
sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

Weinstein, which led to the resignation of four members of TWC's Board and to the

firing of Weinstein.

## V. CLASS ALLEGATIONS

91.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure

23(b)(3) and 23(c)(4) on behalf of herself and the following Class:

> All women who (i) met with Harvey Weinstein in person to
> audition for or to discuss involvement in a project to be
> produced or distributed by The Weinstein Company
> Holdings, LLC, and/or (ii) before September 30, 2005, met
> with Harvey Weinstein in person to audition for or to discuss
> involvement in a project to be produced or distributed by
> Miramax LLC.

92.    The Class consists of dozens, if not hundreds, of women, making joinder

impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class

and the identities of the individual members are ascertainable through records

maintained by Weinstein, the Complicit Producers, and members of the Weinstein

Sexual Enterprise. For example, one former employee of the Complicit Producers told

*The New Yorker* that "she was asked to keep track of the women, who, in keeping with

a practice established by Weinstein's assistants, were all filed under the same label in

her phone: F.O.H., which stood for 'Friend of Harvey.'"[88]

---

[88] https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

CLASS ACTION COMPLAINT

93.     The claims of Plaintiff are typical of the Class. The claims of the Plaintiff and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

94.     There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

95.     Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

a.     Whether Defendants engaged in a scheme with the Intelligence Participants, Law Firm Participants, Journalist Participants and others to use false pretenses to tamper with victims and witnesses of Weinstein's sexual misconduct in order to prevent the publication, prosecution or reporting of Weinstein's sexual misconduct and to destroy evidence.

b.     Whether Defendants violated RICO, 18 U.S.C. § 1962.

c.     Whether Weinstein engaged in a pattern and practice of sexual harassment, assault, and battery.

d.     Whether Weinstein's pattern and practice of sexual harassment, assault and battery was committed within the scope of his employment at Miramax or TWC.

e.     Whether TWC or Miramax had knowledge of Weinstein's pattern and practice of sexual harassment, assault, and battery.

f.     Whether TWC or Miramax facilitated Weinstein's pattern and practice of sexual harassment, assault, and battery.

g.     Whether TWC or Miramax ratified Weinstein's pattern and practice of sexual harassment, assault, and battery.

CLASS ACTION COMPLAINT

h. Whether Weinstein, TWC or Miramax engaged in conduct designed to suppress complaints or reports regarding Weinstein's conduct.

i. Whether Miramax or TWC negligently retained or supervised Weinstein.

j. Whether Miramax and TWC are responsible for Weinstein's conduct under the doctrine of *respondeat superior*.

96. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to TWC and Miramax's legal responsibility for Weinstein's actions, in that it conserves the resources of the courts and the litigants and promotes the consistency and efficiency of adjudication.

97. Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and have the financial resources to do so. Neither Plaintiff nor her counsel have any interests adverse to those of the other members of the Class.

# VI.  CAUSES OF ACTION

## COUNT I

### VIOLATION OF 18 U.S.C. § 1962(C)
### (THE WEINSTEIN SEXUAL ENTERPRISE)

98.   Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

99.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

100.   The Weinstein Sexual Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; (ii) the Weinstein Participants; (iii) the Intelligence Participants; (iv) the Firm Participants; (v) the Journalist Participants, (v) the Film Participants, and other unnamed co-conspirators as set forth *supra*. The Weinstein Sexual Enterprise is an ongoing organization that functions as a continuing unit. The Weinstein Sexual Enterprise was created and used as a tool to effectuate Defendants' 02qk3-Jc (last accessed November 2, 2017). It is also availableleistinct from the Weinstein Sexual Enterprise.

101.   The Weinstein Sexual Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) harassing, threatening, extorting, and misleading Weinstein's victims and the media to prevent the reporting, disclosure, or prosecution of his sexual

misconduct, and (ii) destroying, mutilating, or concealing records, documents, or other evidence to prevent the use of such evidence to report (or prosecute) his sexual offenses.

102.   Defendants have conducted and participated in the affairs of the Weinstein Sexual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple violations of instances tampering with a witness or victim in violation of 18 U.S.C. § 1512, as described above.

103.   The Weinstein Sexual Enterprise engaged in and affected interstate commerce, because, *inter alia*, Weinstein, TWC, and Miramax contracted with multi-national corporations not only for movie and television productions but also for the investigation, slander, and blackmail of Weinstein's victims.

104.   Defendants exerted control over the Weinstein Sexual Enterprise, and Defendants participated in the operation or management of the affairs of the Weinstein Sexual Enterprise.

105.   Within the Weinstein Sexual Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Weinstein Sexual Enterprise used this common communication network for the purpose of enabling Weinstein's sexual activities.

106.   Each participant in the Weinstein Sexual Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships,

CLASS ACTION COMPLAINT

financial ties, and the continuing coordination of activities. Through the Weinstein Sexual Enterprise, the Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

107.   The RICO Defendants' use of the mails and wires include but are not limited to the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

(a)   Contracts between Weinstein and the Law Firms and Intelligence Participants;

(b)   Wires among the Complicit Producers about Weinstein's sexual misconduct; and

(c)   Wires and mails between the Law Firms and the Intelligence Participants on the subject of Weinstein's sexual activities, his victims, and concealing his activities of sexual misconduct.

108.   The RICO Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

109.   The RICO Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.

110.   The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions,   and other third-party entities in furtherance of the scheme.

111.   The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive the public about Weinstein's sexual activities.

112.   To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness of Weinstein's conduct and the RICO Defendants suppressed and/or ignored warnings from third parties about his conduct.

113.   Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff and others to hide and conceal Weinstein's conduct.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff's property.

114.   The pattern of racketeering activity alleged herein and Weinstein are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Weinstein Sexual Enterprise.

115.   Plaintiff has been injured in her property and business by reason of these violations.  Defendants interfered with Plaintiff's current and prospective contractual relations, because Plaintiff lost employment and employment opportunities as a result of Weinstein's termination of Plaintiff from the role she had been given.  Had

members of the Weinstein Sexual Enterprise not been complicit and had they revealed instead of concealed Weinstein's predatory behavior, Plaintiff and members of the Class would not have been injured. Thus, Plaintiff's injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

116.   By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II

### VIOLATION OF 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(C) (THE WEINSTEIN SEXUAL ENTERPRISE)

117.   Plaintiff incorporates by reference all preceding paragraphs, as if fully set forth herein.

118.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

119.   Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

120.   As demonstrated in detail above, Defendants' co-conspirators, including, but not limited to, the Weinstein Participants, the Intelligence Participants, the Law

Firm Participants, the Film Participants, and the Journalist Participants have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of tampering with a victim or witness in violation of 18 U.S.C. § 1512.

121. The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity. At all relevant times, all Defendant and all Defendants' co-conspirators were aware of the essential nature and scope of the Weinstein Sexual Enterprise and intended to participate in it.

122. As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff has been and is continuing to be injured in her business or property, as set forth more fully above.

123. Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

# COUNT III

## NEGLIGENT SUPERVISION AND RETENTION
## VERSUS MIRAMAX

124.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein. Plaintiff brings Count III under California law against Miramax.

125.    At all times material prior to September 30, 2005, Miramax employed Weinstein and Weinstein was an executive and/or director of Miramax.

126.    Weinstein was unfit or incompetent to work directly with female actresses and posed a particular risk of sexually harassing and assaulting them.

127.    Miramax knew or should have known that Weinstein was unfit or incompetent to work directly with female actresses and posed a particular risk of sexually harassing and assaulting them, and that this unfitness created a particular risk to Plaintiff and the Class.

128.    Weinstein's unfitness and particular risk to female actresses harmed Plaintiff and the Class.

129.    Miramax's negligence in supervising and or retaining Weinstein was a substantial factor in causing harm to Plaintiff and the Class.

1

2

## COUNT IV

## CIVIL BATTERY VERSUS WEINSTEIN AND MIRAMAX

3

4

130.    Plaintiff restates and incorporates herein by reference the preceding

5

paragraphs as if fully set forth herein. Plaintiff brings this Count V against Weinstein

6

and Miramax for the period prior to September 30, 2005.

7

131.    Weinstein intended to commit an act of unwanted contact and/or caused

8

9

imminent apprehension of such an act against Plaintiff and the Class Members. He did

10

so by, *inter alia*:

11

12

      a.    Isolating Plaintiff and Class Members in closed quarters and dismissing any bystanders; and

13

      b.    Demanding or threatening sexual contact.

14

15

132.    Weinstein did commit an unwanted contact with Plaintiff and the Class

16

Members' person or property in a harmful or offensive manner, including, but not

17

limited to, causing sexual contact between Weinstein and each Class Member.

18

19

133.    Weinstein's battery of Plaintiff and the Class caused harm, including

20

physical, mental, and/or emotional harm of each Class Member.

21

134.    Weinstein's conduct was committed within the scope of his employment

22

23

at Miramax. A causal nexus existed between Weinstein's grooming of young actresses

24

to play parts in Miramax's productions and his abuse of his power to coerce and batter

25

those actresses.  Each act of battery of a Class Member lured with the prospect of

26

being cast in a Miramax production was foreseeable given, *inter alia,* the use of

27

28

CLASS ACTION COMPLAINT

Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

135.   Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why female actresses would expect production companies to take extra precautions to ensure that they are protected from the coercive power and lure of a powerful executive promising fame.

136.   Holding Miramax liable furthers the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of Miramax.

## COUNT V

## ASSAULT VERSUS WEINSTEIN AND MIRAMAX

137.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein. Plaintiff brings this Count VII against Weinstein and Miramax for the period prior to September 30, 2005.

138.   Weinstein intended to cause apprehension of harmful or offensive conduct against Plaintiff and the Class Members. He did so by, *inter alia*:

       a.    Isolating Plaintiff and Class Members in closed quarters and dismissing any bystanders;

       b.    Demanding or threatening sexual contact;

c.  Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiff and the Class to fear that Weinstein had the ability to carry out his physical threats; and

d.  Threatening harm to the careers and reputations of Plaintiff and Class Members if they did not participate in such conduct.

139.   Weinstein's actions did, in fact, cause Plaintiff and the Class Members to fear imminent harmful or offensive contact by Weinstein.

140.   Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between Weinstein's grooming of young actresses to play parts in Miramax's productions his abuse of his power to coerce and batter those actresses.  Each act of assault of a Class Member lured with the prospect of being cast in a Miramax production was foreseeable given, *inter alia,* the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

141.   Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. Assaults in the context of the "casting couch" are exactly why female actresses would expect production companies to take extra precautions to ensure that they are protected from the coercive power and lure of a powerful executive promising fame.

142.   Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of

CLASS ACTION COMPLAINT

compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of Miramax.

## COUNT VI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS VERSUS WEINSTEIN AND MIRAMAX

143.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein. Plaintiff brings this Count VI against Weinstein and Miramax for the period prior to September 30, 2005.

144.   Weinstein's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff and the Class Members.

145.   Weinstein's outrageous conduct was not the type of ordinary rude or obnoxious behavior that women should be expected to weather. Rather, Weinstein's conduct exceeded all possible bounds of decency.

146.   Weinstein acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress.  Indeed, he used this distress to subdue and threaten the women and prevent them from complaining or suing based on his actions.  He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

147.   Weinstein's conduct caused suffering for Plaintiff and the Class Members at levels that no reasonable person should have to endure.

148.   Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between Weinstein's grooming of young actresses to play parts in Miramax's productions his abuse of his power to coerce and batter those actresses.  Each act of intentional infliction of emotional distress of a Class Member lured with the prospect of being cast in a Miramax production was foreseeable given, *inter alia,* the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

149.   Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. The intentional infliction of emotional distress in the context of the "casting couch" is exactly why female actresses would expect production companies to take extra precautions to ensure that they are protected from the coercive power and lure of a powerful executive promising fame.

150.   Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of Miramax.

## COUNT VII

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS VERSUS WEINSTEIN AND MIRAMAX

151. Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein. Plaintiff brings this Count VII against Weinstein and Miramax for the period prior to September 30, 2005.

152. Weinstein's conduct negligently caused emotional distress to Plaintiff and the Class Members.

153. Weinstein could reasonably foresee that his action would have caused emotional distress to Plaintiff and the Class Members.

154. Plaintiff and the Class Members were in a specific zone of danger meeting with Weinstein and at risk of physical harm, causing their fear.

155. Plaintiff and the Class Members, immediately or shortly after meeting with Weinstein, suffered distress and emotional harm.

156. Weinstein's conduct was committed within the scope of his employment at Miramax. A causal nexus existed between Weinstein's grooming of young actresses to play parts in Miramax's productions his abuse of his power to coerce and batter those actresses. Each act of negligent infliction of emotional distress of a Class Member lured with the prospect of being cast in a Miramax production was foreseeable given, *inter alia,* the use of Miramax employees to lure the victims and the commission of the acts on Miramax property or at locations paid for by Miramax.

CLASS ACTION COMPLAINT

157.   Weinstein's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of Miramax's business. The negligent infliction of emotional distress in the context of the "casting couch" is exactly why female actresses would expect production companies to take extra precautions to ensure that they are protected from the coercive power and lure of a powerful executive promising fame.

158.   Holding Miramax liable advances the policy goals of *respondeat superior*, including the prevention of future injuries and the assurance of compensation to victims, given that Plaintiff and the Class Members do not have separate remedies under Title VII because they were not employees of Miramax.

**COUNT VIII**

**RATIFICATION VERSUS MIRAMAX**

159.   Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein. Plaintiff brings this Count XIII against Miramax for ratification of Weinstein's sexual misconduct for the period before September 30, 2005.

160.   Weinstein was an agent and employee of Miramax prior to September 30, 2005.

161.   At the time of the acts prior to September 30, 2005, there was an actual or assumed agency relationship between Weinstein and Miramax.

162.   All acts or omissions alleged for the period before September 30, 2005 were ratified by Miramax. Miramax had investigated or knew of the acts and omissions of Weinstein, and Miramax's employees, managers, supervisors, executives, and directors were informed that Weinstein was sexually abusing female actors and refused to take any action to stop him. Moreover, Miramax's managers, supervisors, executives, and directors hid this information so that Weinstein could continue to work for Miramax.

163.   Despite knowledge of Weinstein's sexual misconduct, no disciplinary action was taken and he was allowed to be alone with women who were prospective or actual actors in Miramax productions.

164.   Miramax is thus responsible for Weinstein's acts of assault, battery, and intentional or negligent infliction of emotional distress.

/ / /

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all Class Members prays that this Court:

1.       Certify the Class pursuant to Fed. R. Civ. P. 23(c)(4) for liability and reserve damages and pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief, name Plaintiff as representative of the Class, and appoint her lawyers as Class Counsel;

2.       Enter judgment against Harvey Weinstein on liability on Counts I-VIII in favor of Plaintiff and the Class;

3.       Enter judgment against Miramax LLC on liability on Counts I-VIII in favor of Plaintiff and the Class;

4.       Enter judgment against The Weinstein Company Holdings LLC on liability on Counts I and II in favor of Plaintiff and the Class;

5.       In individual damage proceedings and prove-ups, award Plaintiff and the Class Members damages for pain and suffering, and compensatory and punitive damages.

DATED: November 15, 2017          THE ARMENTA LAW FIRM, APC

By: */s/ M. Cris Armenta*
M. Cris Armenta
Credence E. Sol
1230 Rosecrans Ave, Suite 300
Manhattan Beach, CA 90266
Telephone:  (310) 826-2826 Ext. 108
cris@crisarmenta.com
credence.sol@orange.fr

CLASS ACTION COMPLAINT

Steve W. Berman (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA  91101
Telephone:  (213) 330-7150
elaine@hbsslaw.com

Robert B. Carey
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rob@hbsslaw.com

Elizabeth A. Fegan (*pro hac vice* to be applied for)
Emily Brown (*pro hac vice* to be applied for)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 N. Cityfront Plaza Dr., Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
beth@hbsslaw.com
emilyb@hbsslaw.com

CLASS ACTION COMPLAINT